IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ELNORA A. KELLEY,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )CIVIL ACTION NO. 04-00359-CB-B
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of                      )
Social Security,                     )
                                     )
        Defendant.                   )

## REPORT AND RECOMMENDATION

Plaintiff Elnora A. Kelley ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-411.  This action was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Oral argument was held on June 20, 2005.  Upon careful consideration of the record, the undersigned respectfully recommends that the decision of the Commissioner be **AFFIRMED**.

## I.  Procedural History

Plaintiff filed her first application for disability insurance benefits on March 17, 2000, alleging that she became disabled on July 2, 1999 because of asthma, heart problems, hypertension, and depression.  (Tr. 32-33).  Plaintiff's

application was denied at the initial level on July 3, 2000, and she did not appeal that decision. (Id. at 32-36, 39-43). Plaintiff protectively filed a second application for disability insurance benefits on April 6, 2001, alleging that she had been disabled since July 2, 1999 due to asthma, exhaustion, heart and high blood pressure problems, stress, arthritis, a nervous breakdown and leg and knee pain. (Id. at 17, 64-67, 85, 98, 123). Plaintiff's application was denied on September 27, 2001, and she filed a Request for Hearing on November 19, 2001.[1] (Id. at 17, 44-49).

On March 13, 2002, Administrative Law Judge David R. Murchison ("ALJ Murchison") conducted a hearing, which was attended by Plaintiff, her attorney Gilbert B. Laden, Esq., and a vocational expert, James N. Cowart. (Id. at 315-332). On July 17, 2002, ALJ Murchison entered an unfavorable decision wherein he found that Plaintiff retained the residual functional capacity for work at the light exertional level and could return to her past relevant work as an insurance agent. (Id. at 14-25, Findings 3, 5). On April 9, 2004, Plaintiff's request for review was denied by the Appeals Council, thus making the ALJ's decision the final decision of the Commissioner of Social

---

[1]The application was treated as a prototype case and as such, the reconsideration stage was eliminated pursuant to 20 C.F.R. § 404.906.

2

Security under 20 C.F.R. § 404.955.  (Tr. 1A-4).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

## II.  __Factual Background__

Plaintiff was born on November 9, 1942, and was 59 years old at the time of the hearing.  (Tr. 19, 64).  Plaintiff has a twelfth grade education and completed a two year culinary arts program at Carver State Technical School.  (Id. at 265, 318).  She has past relevant work experience as an insurance agent.  (Id. at 24, 319, 326-327).  Plaintiff worked as an insurance agent for 25 years, and in so doing, did door to door sales, discussed policies with people who came to the office, and used the telephone to talk with clients.  (Id. at 326-327).  Plaintiff testified that when she worked, she traveled and had a lot of interaction with people.  (Id. at 323).  According to Plaintiff, she left her job because she "just couldn't handle it anymore;" she was under "so much stress and pressure."  (Id. at 319).  Plaintiff testified that she is unable to work because she has had a nervous breakdown, has bad nerves, has had to cope with the death of several family members, has high blood pressure, and low potassium.  (Tr. 318-322).  Plaintiff also reported problems sleeping and eating irregularities.  (Id. at 324-325).  She further testified that she sometimes experiences

3

problems concentrating, remembering and staying focused. (<u>Id</u>. at 331).

Concerning her daily activities, Plaintiff testified that she spends her days "[m]ostly in bed[,]" but also indicated that she listens to the radio, visits with a couple of her friends, talks on the telephone and goes to church on Sunday. (<u>Id</u>. at 319, 323-324). Plaintiff also indicated that she does some driving, grocery shopping, and prepares some of her meals. (<u>Id</u>. at 323-324). According to Plaintiff, her adult daughter, who resides with her, also shops and prepares meals for her. (<u>Id</u>.)

The ALJ concluded that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of disability of July 2, 1999. (Tr. 24, Finding 1). The ALJ additionally found that Plaintiff suffers from the severe impairments of hypertension, hypokalemia, obesity, gastroesophageal reflux disease, borderline cardiomegaly and arthritis of the knee. (<u>Id</u>. at 24, Finding 2). The ALJ also determined that while Plaintiff alleges a disabling mental impairment, the record evidence does not establish the impairment was severe. (<u>Id</u>. at 23). Next, the ALJ found that Plaintiff does not have an impairment or a combination of impairments listed in or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (<u>Id</u>. at

4

24, Finding 2).  The ALJ then determined, based on the medical evidence and Plaintiff's subjective complaints, that she retains the residual functional capacity to perform a full range of work at the light exertional level[2] which is not compromised by any significant nonexertional limitations.  (Id. at 24, Findings 3-4).  Thus, he found that Plaintiff can return to her past relevant work as an insurance agent.  (Id. at 24, Finding 5).

## III. Issues On Appeal

A.   Whether the ALJ erred in finding that Plaintiff's depression is a non-severe impairment and thus, also erred in rejecting the opinion of Dr. Welsh?

B.   Whether the ALJ erred in assessing Plaintiff's credibility?

## IV. Analysis

### A.   Standard of Review

In reviewing claims brought under the Act, this court's role is a limited one.  The court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir.

---

[2]Lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm of leg controls.  To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities.  If an individual can do light work, there is a determination that she can also do sedentary work unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(c).

1990).[3]   A court  may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).   The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").   In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. Lexis 10163 (S.D. Ala.).

**B.  Discussion**

An individual who applies for Social Security disability benefits must prove her disability.  See 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

---

[3]This court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.[4] In case sub judice, the ALJ applied the five-step process in evaluating Plaintiff's claim, and as noted supra, he determined that Plaintiff retains the residual functional capacity

_____

[4]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

to perform a full range of light work, and thus can return to her past relevant work as an insurance agent.  (Tr. 17-25).

    1.  **No de facto reopening occurred**.

    At oral argument, Plaintiff asserted for the first time, that the ALJ effectively de facto reopened her first disability claim by considering and relying upon evidence submitted in conjunction with that claim.  Defendant, on the other hand, argued that the ALJ simply reviewed some of the medical evidence from the prior claim in connection with assessing Plaintiff's instant claim; thus, no de facto reopening occurred, and res judicata precludes a finding of disability prior to July 3, 2000, the date on which Plaintiff's initial claim was denied.

    When a final decision is made with respect to a Social Security claim, the doctrine of res judicata ordinarily bars a claimant from filing a later application reasserting the same claim.  20 C.F.R. § 404.957(c)(1).  However, the Commissioner has discretion to reopen the previous claim for any reason within twelve months of the date of the notice of the initial determination, or for good cause after one year but within four years.  20 C.F.R. § 404.988.  The Commissioner's determination that a claim is barred on res judicata grounds is subject to review by the District Court, but the District Court lacks jurisdiction to review the denial of a request to open a

previously decided case because such a denial is not a "final decision" within the meaning of 42 U.S.C. § 405.

There are, however, two ways in which a case may be reopened. The ALJ may make an express determination pursuant to 20 C.F.R. 404.988 that the case should be reopened, or the ALJ may "constructively" or de facto reopen the case by reconsidering the prior claim on its merits. See, e.g., Wolfe v. Chater, 86 F.3d 1072, 1078-1079 (11th Cir. 1996) (reopening occurred when an ALJ, considering a third application for benefits, reexamined the merits of a determination on the first and second applications concerning a claimant's educational level). A prior disability claim is not deemed to have been reconsidered on the merits merely because the evidence reviewed by the ALJ included evidence of the claimant's condition at the time of the previous application. Id. at 1079 (stating that the ALJ's examination of the conflicting vocational expert testimony from the prior two hearings was appropriate and did not constitute a reopening of the prior decision). See also Rohrich v. Bowen, 796 F.2d 1030, 1031 (8th Cir. 1986) (holding that an ALJ's review of a prior medical examination from a prior application did not amount to a reconsideration of the prior application on its merits). An ALJ is "entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative

medical history necessary to determine whether the claimant was disabled at the time of his second application." <u>Frustaglia v. Secretary of Health and Human Services</u>, 829 F.2d 192, 193 (1st Cir. 1987). Furthermore, it may be necessary to consider evidence regarding the claimant's condition at the time of the previous denial in order to determine whether the second claim is the same as the first claim for <u>res judicata</u> purposes. <u>See</u> <u>Cash v. Barnhart</u>, 327 F.3d 1252, 1256 (11th Cir. 2003)(finding that the ALJ must be allowed some leeway, however, to evaluate how newly presented evidence relates back to the prior application, to decide whether or not to reopen the case under 20 C.F.R. §§ 404.988 and 404.989). If simply reviewing evidence relating to a previous claim is viewed as a reconsideration on the merits, the previous case would be reopened virtually every time a successive claim is filed. <u>Girard v. Chater</u>, 918 F. Supp. 42, 45 (D.R.I. 1996) (holding that the ALJ did not constructively reopen a claimant's application by considering evidence regarding claimant's physical condition during the period preceding the original application).

Plaintiff herein never requested that her prior decision be reopened; however, at oral argument, her counsel asserted, in response to Defendant's <u>res judicata</u> argument, that the ALJ had <u>de facto</u> reopened the earlier decision because in the instant

decision, he referenced evidence submitted in the first case, but did not address <u>res judicata</u> at all.  Based upon a review of the record, the undersigned finds that while the ALJ considered medical evidence regarding Plaintiff's condition at the time of the previous application,[5] there is nothing to suggest that he reviewed the merits of Plaintiff's first application.  Instead, it appears clear, that the ALJ reviewed some of the medical evidence from the application for the limited purpose of gaining insight into Plaintiff's medical history, to aid him in determining whether she was disabled at the time of her second application.  Accordingly, no <u>de facto</u> reopening occurred and <u>res judicata</u> precludes a finding of disability prior to July 3, 2000.

**2.   <u>Plaintiff's depression does not meet the severity and duration requirements</u>.**

A review of the administrative record reveals the presence of medical reports and data from a number of sources.  The records reflect that Plaintiff was treated by Henrietta Kovacs, M.D., (hereinafter "Dr. Kovacs"), during the July 1999-2001 time frame for hypokalemia, chest pain, hypertension and depression.  (Tr.

---

[5]In the ALJ's decision, he referenced the following evidence from Plaintiff's prior claim (<u>i.e.</u>, evidence on or before July 3, 2000): 1) a undated Disability Report (Tr. 84-95); 2) a March 22, 2000 Daily Activities Questionnaire (<u>id</u>. at 108-117); 3) a March 27, 2000 Pain Questionnaire (<u>id</u>. at 95-96); 4) a May 24, 2000 consultative examination (<u>id</u>. at 194-195); and 5) a July 3, 2000 residual functional capacity form (<u>id</u>. at 197-204).  (<u>Id</u>. at 20-21).

188-193, 208-228, 297).  The notes indicate that May 29, 2000 was the first instance in which Dr. Kovacs diagnosed Plaintiff with depression.  (Id. at 189-190, 220-221).  She noted that Plaintiff appeared "quite distraught," and complained that she could not sleep and was depressed.  (Id.)  According to Dr. Kovacs, Plaintiff was alert, oriented, crying off and on, and appeared depressed.  (Id.)  She was given Aciphex, and prescribed Celexa. (Id.)  She was also instructed to continue taking Cardura, Diovan HCT, and K-Dur 20 m.g., which had been prescribed earlier for her other ailments.  (Id.)

Dr. Kovacs' June 12, 2000 treatment notes reflect that Plaintiff appeared alert, oriented, and depressed, and that during the visit, she burst into tears but did not explain why she was crying.  (Tr. 188, 218).  Plaintiff advised Dr. Kovacs that she could not afford any medication, and that she had been taking samples of Cardura, Divan and Celexa.  (Id.)  Dr. Kovacs diagnosed hypokalemia, chest pain, hypertension, and marked depression. (Id.)  Plaintiff was continued on Celexa for her depression and was provided with medication samples.  (Id.)

Dr. Kovacs' June 28, 2000 treatment notes reflect that Plaintiff appeared just a little bit less depressed, and was directed to continue taking the Celexa and her other medication. (Id. at 219).  She was diagnosed with hypokalemia, depression,

severe, and hypertension. (Id.) Plaintiff was also provided with more medication samples. (Tr. 219). The notes reflect that on August 25, 2000, Plaintiff was again provided with medication samples. (Id.) Dr. Kovacs' September 13, 2000 notes reflect that Plaintiff reported that she had been without her medication for several days, and in response thereto, was provided with more samples. (Id. at 216-217). Dr. Kovacs listed her impressions as persistent hypokalemia, hypertension (not yet under control), and depression/anxiety. (Id.) She also noted noncompliance due to financial reasons. (Id.) Plaintiff was provided with a six week supply of her medications and was encouraged to apply for Medicaid due to her financial situation and the fact that the doctor would not always be able to supply her with samples. (Id.)

At the request of the State Agency, Plaintiff underwent a consultative psychological evaluation with Clinical Psychologist Annie Formwalt, Psy. D., (hereinafter "Dr. Formwalt"), on May 10, 2000.[6] (Tr. 171-173). Plaintiff reported sleep disturbances, erratic appetite patterns, feelings of sadness, social withdrawal and hopelessness. (Id.) She denied any suicidal or homicidal ideations. (Id.) Dr. Formwalt observed that Plaintiff's affect was sad and tearful, that she cried throughout the majority of the

_____

[6]This referral was in connection with Plaintiff's initial application.

interview, her dress and grooming were appropriate, she was oriented in all four spheres, her concentration appeared impaired, she had no problems with change-making and simple arithmetic, she had no problem with immediate memory, her thought processes were intact, she did not appear anxious; however, her mood seemed depressed, her insight and understanding of herself were fair, her judgement was fair, and she could likely manage her own funds. (Id. at 171-173). Dr. Formwalt concluded that Plaintiff would likely receive some benefit from treatment within the next six to twelve months. (Id. at 173).

At the request of the State Agency, Plaintiff underwent a consultative physical examination on May 24, 2000 by John Lowery, M.D., (hereinafter "Dr. Lowery").[7] (Tr. 194-195). He observed that Plaintiff was alert, but her effect was very flat, and she did not maintain eye contact. (Id. at 194). Dr. Lowery opined that neurologically, Plaintiff was essentially normal other than her effect. (Id. at 195). His diagnosis was asthma, hypertension, depression, cardiomegaly (by history), and chest pain. (Id.)

At the request of the State Agency, Donald E. Hinton, Ph.D., (hereinafter "Dr. Hinton"), prepared a Psychiatric Technique

---

[7] This referral was in connection with Plaintiff's initial application.

Review Form on May 18, 2000 (Tr. 174-187), and a Functional Capacity Assessment dated July 3, 2000 (id. at 197-204), following a review of Plaintiff's medical records.[8]  On the Psychiatric Form, Dr. Hinton noted that Plaintiff takes care of her personal needs, cooks, shops, does some laundry, watches TV, reads, goes to church and the store, gets along with others, visits, talks on the phone, and with appropriate health treatment and compliance, significant progress in her depression should be noted. (Id. at 175).  He diagnosed affective disorder as evidenced by major depression. (Id. at 175-177).  He also concluded that Plaintiff's general report of limitations appeared inconsistent with the findings and her symptoms were felt to be partially credible. (Id. at 183).  With respect to Plaintiff's physical limitations, Dr. Hinton opined that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds. (Id. at 198).  He also opined that Plaintiff could stand and/or walk about six hours in an eight hour work day, could sit about six hours in an eight hour workday, and her ability to push and or pull was unlimited.  (Tr. 198).

In December 2000, Plaintiff's blood pressure was "sky high" and she reported to Dr. Kovacs that she had been out of her medicine for one and one-half months.  (Id. at 215).  She was

---

[8]This referral was in connection with Plaintiff's initial application.

given samples of Diovan; however, Dr. Kovacs did not have any Celexa samples to give her. (Id.) Dr. Kovacs diagnosed escalating hypertension, hypokalemia, and "[g]ross noncompliance with medical advi[c]e, partially related to financial situation but partially I think it's the patient's negligence and depression . . . ." (Id.)

Plaintiff saw Dr. Kovacs again, more than three months later, on April 25, 2001. (Id. at 213-214). Dr. Kovacs noted that Plaintiff was "always in a depressed mood" and that her affect was "flat." (Id. at 213). She also questioned Plaintiff's efforts to occasionally pay for her own medication, and diagnosed her with hypertension, hypokalemia, depression, and non-compliance of medical therapy for financial reasons. (Tr. 213). Plaintiff was provided with samples and directed to return in three months. (Id. at 213-214).

Dr. Kovacs completed a Request for Medical Information form for the Department of Human Resources Food Stamp Program dated May 10, 2001, in which she opined that Plaintiff was mentally and physically unable to work because of hypertension and depression. (Id. at 297). She also indicated that the condition was expected to be permanent. (Id.)

Plaintiff returned to Dr. Kovacs on June 8, 2001 requesting medication samples. (Id. at 211-212). She indicated that she

16

could not afford medicine because of her husband's illness, but did not voice any particular complaints. (Id. at 211). Dr. Kovacs' notes reflect that the Celexa helped with Plaintiff's anxiety; however, Dr. Kovacs did not think Plaintiff's depression was resolved. (Tr. 211). She observed that Plaintiff appeared to be "very bitter." (Id. at 212). Plaintiff was diagnosed with poorly controlled hypertension, resolved electrolyte imbalance, monitoring of high risk medications, depression, and questionable noncompliance. (Id.) She was given medication samples and a prescription for K-Dur. (Id.) She was advised to follow-up in two months. (Id.) A July 25, 2001 entry reflects that Plaintiff was seen for lab work and a blood pressure check. (Id.) There is also a notation that Plaintiff had visited ER the preceding Sunday for depression and anxiety. (Tr. 212).

On July 19, 2001, Plaintiff, at the request of the State Agency, underwent a psychological examination conducted by Clinical Psychologist Patricia G. McCleary, Ph.D., (hereinafter "Dr. McCleary"). (Id. at 205-207). Plaintiff reported to Dr. McCleary that she had been hospitalized in 1976 for emotional problems, but she was not currently in treatment. (Id. at 205). She also reported that she left her insurance job after 25 years because she could not take the pressure anymore. (Id. at 205-206). Additionally, she stated that she lives with her adult

daughter, she is independent in activities of daily living, she has no hobbies, but attends church on a regular basis. (Id. at 206). Plaintiff also reported that her husband was in the hospital and might be dying, and that she has experienced depression over the loss of family members throughout the years, including five deaths between 1996 and 1998. (Id.)

Dr. McCleary observed that Plaintiff's grooming and hygiene were adequate, she was alert and attentive, she was oriented to time, place and person, her recent and remote memory were intact, her affect was stable, her thinking was clear and coherent, her mood appeared mildly depressed, she did not exhibit any delusional ideation, she had no difficulty following simple and complex verbal commands, and her thinking was concrete. (Tr. 206). Dr. McCleary determined that Plaintiff had a restricted lifestyle, that she was independent in her daily activities, that she helps to maintain her home, can manage her own financial benefits, and can understand, carry out and remember simple and complex verbal instructions. (Id. at 207). She diagnosed Plaintiff with mild depression related to the hospitalization of her husband and the deaths of family members over the last 40 years. (Id.) She opined that Plaintiff would benefit from therapy sessions at the Mobile Mental Health Center for help with coping with her husband's illness, her physical restrictions and her changed life

18

circumstances. (Id.)

Plaintiff returned to Dr. Kovacs on August 6, 2001. (Id. at 210). She reported that her husband had died the prior night, and that she had a severe throbbing headache. (Id.) Dr. Kovacs observed that Plaintiff was crying, her blood pressure was elevated and she was not "feeling well at all." (Tr. 210). According to Dr. Kovacs, Plaintiff was alert, but she could not get much information out of her. (Id.) Dr. Kovacs' diagnosis was anxiety/depression, crying, hypertension (escalating), headache (most probably related to anxiety), and electrolyte imbalance (resolved). (Id.) She was given Klonopin for anxiety and insomnia, Demerol 50, and Phenergan 25 IM for the severe headache. (Id.) Plaintiff was also directed to continue on Serzone as previously ordered, and was given a prescription for Tylenol #3 #30 for headaches. (Id.)

On August 13, 2001, Plaintiff underwent a consultative examination performed by Eric Becker, D.O., (hereinafter "Dr. Becker"), and his staff, at the request of the State Agency. (Id. at 229-233). Plaintiff reported that she was unable to work due to stress, heart problems and "lots of things." (Id. at 229). Plaintiff also reported arthritis of the right leg, knee and foot, left hip pain, problems with her nerves, an enlarged heart and hypertension. (Tr. 229). A physical examination revealed a

19

supple neck with no adenopathy, clear lungs, a normal heart rhythm, and no edema or synovitis of her extremities. (<u>Id</u>.) Plaintiff was unable to squat, heel-to-toe walk, or walk on her tip toes, due to her sedation. (<u>Id</u>.) Although Plaintiff complained of pain over her entire back, when it was palpated, her straight leg raising tests were negative and her neurological examination was intact. (<u>Id</u>.) Dr. Becker diagnosed Plaintiff with sedation (questionable over medication), uncontrolled hypertension, left ventricular dysfunction, a history of osteoarthritis, depression, and borderline cardiomegaly. (<u>Id</u>. at 230).

Plaintiff returned to Dr. Kovacs on August 28, 2001 for a reevaluation of her hypertension and headaches. (Tr. 208-209). She complained about cervical pain. (<u>Id</u>. at 208). She was diagnosed with hypertension (still poorly controlled), cervical strain and pain, depression, noncompliance, and obesity. (<u>Id</u>.) Plaintiff was provided with samples of Diovan HCT and Serzone as well as given a prescription for Flexaril 10 m.g. and Celebrex 200 m.g. for her neck and back pain. (<u>Id</u>. at 209). Plaintiff subsequently advised Dr. Kovacs' office by telephone, on September 25, 2001, that she had not filled her prescriptions because she had no money or insurance. (<u>Id</u>.) She was given samples of Norvasc, and advised to contact Catholic Social Services. (<u>Id</u>.)

In September 2001, William H. Simpson, Ph.D., (hereinafter "Dr. Simpson"), a State Agency psychologist, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form. (Tr. 242-255).  He concluded that Plaintiff's mental impairment was not severe and would not cause her more than mild restrictions with respect to her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence and pace.  (Id. at 252).  He further concluded that Plaintiff's impairment would cause no episodes of decompensation. (Id.)

In October 2001, Plaintiff sought treatment from the Franklin Primary Health Center.  (Id. at 256-260).  She reported that she fell on her left hip when her right leg gave way.  (Id. at 259). She complained of hip pain and depression.  (Id.)  Her mood was sad, and she reported that her husband had recently died and that she was experiencing insomnia. (Tr. 259).  A physical examination revealed normal neurological findings and no musculoskeletal abnormalities, except pain.  (Id. at 260).  Treatment notes reflect that Plaintiff's hypertension was not well controlled and her potassium level was borderline low.  (Id.)  She was referred to the Mobile Mental Health Center for further evaluation and

treatment.[9]  (Id.)

On October 19, 2001, Plaintiff was initially treated at the Mobile Mental Health Center.  (Id. at 278-281).  Her chief complaints were depression, poor sleep, increased anxiety and crying spells.  (Id. at 278).  She reported a longstanding history of depression since childhood.  (Tr. 278).  The treatment notes reflect that she was tearful, neatly groomed, her affect was constricted, her thought process was non-delusional and goal directed, she reported hearing voices sometimes, her memory was intact, her insight and judgment were fair.  (Id. at 280).  She was diagnosed with major depressive DO, recurrent, severe.  (Id. at 281).  Plaintiff was to be waned off Serzone and was directed to stop Celexa.  (Id.)  She was prescribed Paxil.  (Id.)

Between October 22, 2001 and December 5, 2001, Plaintiff was treated at the Mobile Mental Health Center.  (Tr. 272-277).  Treatment notes indicate that Plaintiff's memory and concentration were unimpaired and her thought process was logical, coherent and

---

[9]Subsequent treatment notes from the Franklin Center reflect that as of November 12, 2001, Plaintiff's mood was sad and her affect was flat; she was diagnosed with depression, and it was noted that "hopefully somatic complaints will improve when depression better controlled." (Tr. 286-287).  The December 7, 2001 treatment notes reflect that Plaintiff reported that her depression was getting a little better, and that she was less depressed.  (Id. at 284-285).  The February 5, 2002 treatment notes reflect that Plaintiff was reporting some insomnia, but the depression was better.  (Id. at 282-283).

within normal limits.  (Id.)  Plaintiff reported feeling sad and helpless, but her appetite and sleep were fair.  (Id.)  While Plaintiff had initially presented with a sad and tearful mood, treatment notes dated November 15, 2001 indicate that Plaintiff's depressive symptoms were better, and she reported that she was feeling better. (Id. at 276).  She was continued on Paxil. (Id.) On December 5, 2001, Plaintiff reported that she was crying less and sleeping better.  (Id. at 272).  Her Paxil was increased to 40 m.g. and she was directed to return in one month.  (Tr. 272).

On December 19, 2001, Plaintiff underwent a psychological evaluation by D. Kent Welsh, Ph.D, (hereinafter "Dr. Welsh"), at the request of her attorney.  (Id. at 264-267).  Plaintiff reported that pain in her back, legs and feet, as well as her depression, interfered with her ability to function.  (Id. at 264).  She also reported that she retired from her insurance job because she had given "out." (Id. at 265).  Her nerves were bad, and she was on "edge" all the time.  (Id.)  She reported that from 1995 to present, many close family members and friends had died, including four aunts in the 1995-1996 time frame, her granddaughter in 1996, three of her sisters-in-laws from 1999-2001, her husband in August 2001, and a close friend in September 2001. (Id. at 265).  Plaintiff also reported that she spent most of her time at home, that she slept a lot, that she occasionally

helped her daughter with laundry, cooking and shopping, and that she attended church on a regular basis. (Tr. 265).

Dr. Welsh observed that Plaintiff was alert and oriented as to time, place, person and situation, and was extremely depressed and teary. (Id. at 266). Plaintiff acknowledged some suicidal thoughts, but no current plans. (Id.) She also reported sleep interruption, and that she was currently taking Diovan, D-Dur20, Flexeril, Paxil and Norvasc. (Id.) Dr. Welsh found that Plaintiff could complete simple math problems, her immediate, recent and remote memory function was somewhat impaired, she demonstrated difficulty concentrating and paying attention to information, and her judgment was adequate to make work decisions and manage her own financial affairs. (Id.) The MMPI-2 was not administered due to Plaintiff's difficulty with attention and concentration as well as the slowness of her performance. (Id.) Dr. Welsh opined that treatment thus far had been unsuccessful, and that Plaintiff could not complete tasks in a timely manner due to problems with concentration, pace and persistence. (Tr. 267). He also opined that Plaintiff had withdrawn from contact with most people and was unable to maintain her previous level of social functions. (Id.) He diagnosed Plaintiff with major depressive disorder, and assigned her a current GAF score of 40, as well as a 40 for the prior year. (Id.)

24

On January 7, 2002, Dr. Welsh completed a Mental Residual Functional Capacity Questionnaire, in which he determined that Plaintiff had: moderate limitations in activities of daily living; marked limitations in maintaining social functioning; extreme deficiencies of concentration, persistence or pace; and four or more episodes of decompensation at work or in a work-like setting. (Id. at 268-270).  He also rated Plaintiff as moderately impaired in her ability to understand, carry out and remember instructions and respond appropriately to supervision and co-workers and perform simple and repetitive tasks.  (Id.)  Additionally, he rated Plaintiff as extremely limited in her ability to respond appropriately to customary work pressures, and opined that she was extremely depressed and that her medication (Paxil) was not effective in managing her depression.  (Id.)

During the January through March 2002 time frame, Plaintiff was treated at the Mobile Mental Health Center.  (Tr. 289-292, 298-299).  In early January 2002, Plaintiff reported that she spent the Christmas holidays relaxing at her son's house in Georgia.  (Id. at 291).  She reported that she was feeling better, and that she was not crying as much.  (Id.)  She also reported feeling tired, and the therapist suggested that Plaintiff have her thyroid hormones checked and restart her medicine for anemia. (Id.)  The therapist noted that Plaintiff's appearance was

appropriate, her mood was normal, her affect was flat, her speech was vague, her appetite and sleep were fair, she did not have any suicidal or homicidal thoughts, her memory was unimpaired, her thoughts were logical and coherent, her concentration was unimpaired, and she was compliant with her medication. (Id.)

Treatment notes from another early January 2002 visit reflect that Plaintiff reported that she was sleeping well most nights, except when she had muscle spasms. (Id. at 292). During that visit, the therapist noted that Plaintiff's appearance was appropriate, her mood was normal, her affect was appropriate to situation, her speech was unimpaired, her appetite/sleep were fair, she did not have any suicidal or homicidal thoughts, her memory was unimpaired, her thoughts were logical and coherent, her concentration was unimpaired, and she was compliant with her medication. (Id.) Plaintiff was continued on Paxil. (Tr. 292).

During Plaintiff's January 24, 2002 visit, she related that her sister was in the hospital and that her prognosis was not good. (Id. at 290). The treatment notes reflect that Plaintiff was distraught by the loss of so many of her family members. (Id.) The therapist noted that Plaintiff's appearance was appropriate, her mood was sad, her affect was tearful, her speech was unimpaired, her appetite was fair, her sleep was good, she did not have any suicidal or homicidal thoughts, her memory was

unimpaired, her thoughts were logical and coherent, her concentration was unimpaired, and she was compliant with her medication. (<u>Id</u>.)

During Plaintiff's February 7, 2002 visit, she reported that she was not doing well because her sister was now in the psychiatric ward at Mobile Infirmary following an incident with her boyfriend and police officers. (<u>Id</u>. at 289). Plaintiff was encouraged to plan some activities that would give her some good memories of her sister. (<u>Id</u>.) The therapist noted that Plaintiff's appearance was appropriate, her mood/affect were sad, her speech was unimpaired, her appetite/sleep were good, she did not have any suicidal or homicidal thoughts, her memory was unimpaired, her thoughts were logical and coherent, her concentration was unimpaired, and she was compliant with her medication. (Tr. 289).

Plaintiff was treated again on February 22, 2002. (<u>Id</u>. at 299). During this visit, Plaintiff reported problems sleeping at night, and indicated that she feels tired and depressed "some during the day." (<u>Id</u>.) The therapist noted that Plaintiff's appearance was appropriate, her mood was sad, her affect was tearful, her speech was unimpaired, her appetite/sleep were fair, she did not have any suicidal or homicidal thoughts, her memory was unimpaired, her thoughts were logical and coherent, her

concentration was unimpaired, and she was compliant with her medication. (Id.) Plaintiff was continued on Paxil, and prescribed Wellbutrin (an anti-depressant). (Id.)

During her March 1, 2002 visit, Plaintiff indicated that she still felt depressed and tired during the day, but that the Wellbutrin seemed to help her during the day. (Id. at 298). The therapist noted that Plaintiff's appearance was appropriate, her mood was normal, her affect was appropriate to the situation, her speech was unimpaired, her appetite was good, her sleep was fair, she did not have any suicidal or homicidal thoughts, her memory was unimpaired, her thoughts were logical and coherent, her concentration was unimpaired, and she was compliant with her medication. (Tr. 298). She was continued on Paxil, and her Wellbutrin was increased to 150 m.g. (Id.)

William Bell, M.D., (hereinafter "Dr. Bell"), authored a one-line written opinion, dated March 29, 2002, that stated that Plaintiff was emotionally disabled. (Id. at 314). At the request of the State Agency, Dr. Bell also examined Plaintiff on May 3, 2002, and completed a written evaluation on May 10, 2002. (Id. at 306-313). Plaintiff's chief complaint was stress. (Id. at 306). She reported that she quit her insurance job because of severe stress and bad nerves. (Id.) She indicated that she had a history of depression, that she was hospitalized for a nervous

28

breakdown in 1976, that she was depressed over the deaths of multiple relatives and close friends, and that the recent death of her husband had caused her to become very withdrawn.  (Tr. 306).  She also reported non-specific problems such as pain in her legs, shoulders, ankles and feet.  (Id.)  During his physical examination of Plaintiff, Dr. Bell found that her motor and sensory functions were intact, she was able to ambulate without assistance and she did not have any edema, clubbing or cyanosis. (Id. at 307).  He also noted that Plaintiff was unable to squat and kneel because of alleged pain in her legs, and was unable to flex beyond 60 without complaining of pain in her back.  (Id.) He further found that Plaintiff has hypertension, a history of recurrent chest pain and arthritis in her knees which tends to interfere with her normal activities.  (Id.)  He also found that Plaintiff was oriented to time, place and person and answered questions appropriately, but appeared "rather despondent" and somewhat[10] withdrawn.  (Id.)  Dr. Bell opined that Plaintiff was "obviously depressed."  (Tr. 307).

Plaintiff also underwent a consultative psychological examination with Psychiatrist C.E. Smith, M.D., (hereinafter "Dr.

---

[10]Dr. Bell also completed a Medical Source Opinion (Physical) in which he opined that within an eight hour day, Plaintiff could stand three hours, walk two hours and sit four to six hours.  (Tr. 309-313).  He further opined that Plaintiff could occasionally lift and carry 25 pounds.  (Id. at 309).

Smith"), on May 10, 2002.  (<u>Id</u>. at 300-302).  Plaintiff reported her medical problems as asthma, hypertension, "nerves," tension, depression and stresses.  (<u>Id</u>.)  She also reported that her regular medications included Wellbutrin and Paxil, antidepressants.  (<u>Id</u>.)  Dr. Smith observed that Plaintiff was appropriately dressed, she was alert and in good contact, her speech articulation was good, she was coherent and showed no thinking disorder, she gave no indication of delusion or hallucinations, she appeared depressed, her affect was adequate and appropriate, she was tearful at times and began screaming in distress near the end of the interview, as she relayed that "my big sister died the other day in my arms."  (<u>Id</u>. at 301).

Dr. Smith diagnosed Plaintiff with major depressive disorder, by history, and bereavement.  (<u>Id</u>. at 302).  He also noted that although Plaintiff was in the "throws of acute bereavement" during the interview, she was alert, performed well, showed no thinking disorder and gave no indication of organicity.  (Tr. 301).  He further found that Plaintiff understood, remembered and carried out complex instructions, she appeared able to manage her own finances, and she showed a good response to the treatment that she received at the Mobile Mental Health Center.  (<u>Id</u>.)

As noted <u>supra</u>, Plaintiff contends that the ALJ erred in finding that she does not suffer from a severe mental impairment.

Plaintiff bases her argument largely on the opinions expressed by her treating physician, Dr. Kovacs, and the residual functional capacity assessment completed by Dr. Welsh at the request of her counsel.  The undesigned is aware of the standard for a non-severe impairment as set forth in Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), which states that an impairment is severe if it causes more than just a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the ability to work without regard to the plaintiff's age, education or work experience.  However, the undersigned also recognizes the standard for review, i.e., is there substantial evidence in the record to support the ALJ's finding.  Substantial evidence which is defined as "more than a scintilla but less than a preponderance," consists of "such relevant evidence as a reasonable person would accept as adequate so support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Bloodsworth, 703 F.2d at 1239.  The "reasonable person" standard dictates that if there is pertinent and adequate evidence supporting a decision, it must be upheld.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Additionally, this Court may neither substitute its own judgment for the Commissioner's nor reevaluate the evidence unless the decision is clearly illogical and unsubstantiated.  Bloodsworth, 703 F.2d at

1239.  See also Powell v. Heckler, 773 F.2d 1572, 1575 (11th Cir. 1985).  Therefore, even when the evidence appears to weigh against the Commissioner's decision, this Court must affirm the decision if there is sufficient supporting evidence.  Martin, 894 F.2d at 1529; Bloodsworth, 703 F.2d at 1239.

Upon consideration of the entire administrative record and Plaintiff's testimony at the administrative hearing, the undersigned finds that the decision of the ALJ, that Plaintiff does not suffer from a severe mental impairment, is supported by substantial evidence.  In concluding that Plaintiff's mental condition does not rise to the level of a severe impairment, the ALJ found that although she had been diagnosed with, and treated for, depression, there is no evidence that her condition satisfies the severity or duration requirements.

The ALJ discussed Plaintiff's treatment records from the Mobile Mental Health Center which consistently indicate that she has no concentration impairments, that her thoughts were logical and coherent, and that her memory was unimpaired.  Additionally, these records reflect that Plaintiff's behavior was consistently described as normal and her affect as appropriate to situation.  The ALJ also found that Dr. Smith's psychological evaluation of Plaintiff, which was conducted a mere two days after the death of her sister, also determined that she had no limitations of

32

functions.   As discussed by the ALJ, Dr. Smith found that Plaintiff had no limitations in the areas of understanding, remembering, or carrying out simple or complex instructions.  The ALJ also determined that Plaintiff has only mild restrictions in her ability to respond appropriately to supervisors, co-workers, customers or other members of the general public, use judgement in making simple or complex work-related decisions, and maintain attention and concentration for at least two hour intervals.

In reaching his decision, the ALJ also relied upon the September 2001 Psychiatric Review Technique Form that was completed by the State Agency Examiner in September 2001.  As noted supra, the examiner specifically found that Plaintiff had only mild restrictions in her activities of daily living and in her abilities to maintain social functions and concentration, persistence and pace.  As correctly noted by the ALJ, while the Form was completed prior to Plaintiff's treatment at the Mobile Mental Health Center, "those treatment records "actually reinforce that  .  .  .  [her] condition was not creating significant limitations."  (Tr. 23).

Although Plaintiff contends that the ALJ failed to give proper weight to the opinion of her treating physician, the undersigned finds that the ALJ was correct in not according full evidentiary weight to the opinion of Dr. Kovacs with respect to

33

Plaintiff's mental impairment.   Generally, the opinion of a treating physician must be given substantial weight, or credit, unless "good cause" is shown to the contrary.   Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159-1160 (11th Cir. 2004); Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Hillsman v. Bowen, 804 F.2d 1179, 1181-1182 (11th Cir. 1986).   However, an ALJ may properly discount the opinion of a treating physician if the opinion is conclusory, inconsistent with their own medical records, or if the evidence supports a contrary finding.   Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 581-582 (11th Cir. 1987)); Lewis, 125 F.3d at 1440.   See also Crawford, 363 F.3d at 1159-1160 (finding that a physician's opinion that a claimant is permanently and totally disabled was inconsistent with his own treatment notes, unsupported by medical evidence and based primarily on the claimant's subjective complaints of pain).   See also 20 C.F.R. § 404.1527(c)(2) (providing that if medical evidence is internally inconsistent, the Commissioner may weigh all the evidence and make a decision if he can do so on the available evidence); 20 C.F.R. § 404.1527(d)(4) (stating that generally, the more consistent an opinion with the record as a whole, the greater weight it will be given).   If the ALJ discounts the opinion of a treating physician,

he must clearly articulate his reasons.  <u>Lewis</u>, 125 F.2d at 1440; <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986).  Also, the ALJ's reasons must be legally correct and supported by substantial evidence in the record.  <u>Crawford</u>, 363 F.3d at 1159-1560; <u>Lamb v. Bowen</u>, 847 F.2d 698, 703-704 (11th Cir. 1988).

In concluding that little evidentiary weight should be afforded to Dr. Kovacs' opinion regarding Plaintiff's mental impairment, the ALJ observed that although Dr. Kovacs opined that Plaintiff was disabled because of her hypertension and depression, she "did not complete the [food stamp] form" and is not a psychiatrist.  (Tr. 20).  Additionally, a review of Dr. Kovacs' treatment notes fails to reveal any functional limitations caused by Plaintiff's depression.  For example, other than to observe that Plaintiff was tearful, crying and depressed, Dr. Kovacs' treatment notes provide no information regarding Plaintiff's concentration, persistence or memory, nor is there any information regarding Plaintiff's ability to respond appropriately to supervision and co-workers, or her ability to understand, remember and carry out simple or complex instructions.  Accordingly, the ALJ was correct in not according persuasive weight to Dr. Kovacs' conclusory opinion regarding Plaintiff's mental impairment.  This is particularly true in light of the treatment records from the Mobile Mental Health Center and Dr. Smith's evaluation.

Likewise, the ALJ was correct in discounting the opinion of Dr. Bell regarding Plaintiff's mental impairment.  In rejecting Dr. Bells's opinion, the ALJ observed that "Dr. Bell is not a psychiatrist, and he performed no medically accepted laboratory or diagnostic techniques to reach his conclusion." (Tr. 20).  A review of Dr. Bell's assessment reveals that aside from his conclusory opinion that "claimant is disabled emotionally," his assessment contains no findings regarding Plaintiff's concentration, persistence or memory, nor is there any finding regarding Plaintiff's ability to respond appropriately to supervision and co-workers, or her ability to understand, remember and carry out simple or complex instructions.  In short, Dr. Bell's assessment did not list any specific limitations caused by Plaintiff's mental conditions.  Accordingly, the ALJ did not err in discounting his opinion.

Similarly, the ALJ did not err in determining that Dr. Welsh's evaluation was not supported by the record evidence.  As correctly noted by the ALJ, many of Dr. Welsh's findings are contradicted by Plaintiff's treatment notes, or are internally inconsistent.  For instance, while Dr. Welsh found that Plaintiff had "extreme deficiencies in concentration and persistence," neither Dr. Kovacs' treatment notes nor the Mobile Mental Health Center notes support such a conclusion.  In fact, as noted _supra_,

the Mobile Mental Health Center notes consistently reflect that Plaintiff does not have any concentration impairments.  The Mobile Mental Health Center treatment notes for the December to January 2002 time frame, which were recorded in close proximity to Plaintiff's examination by Dr. Welsh, reflect that Plaintiff was sleeping better and was not as depressed.  <u>See</u> <u>supra</u>.  Likewise, the December 7, 2001 treatment notes from the Franklin Primary Health Center reflect that Plaintiff reported that her depression was better.  Additionally, while Dr. Welsh assigned Plaintiff a GAF score of 40 during 2001 and 2002 and found that she had marked limitations on her ability to maintain social functioning and would experience four or more episodes of decompensation in a work setting, there is nothing in Plaintiff's treatment notes, her daily activities questionnaires or her hearing testimony which supports such a finding.

The record evidence reflects that while Plaintiff was hospitalized following some type of nervous breakdown in 1976, she responded well to treatment and remained employed in the insurance field until 1999.  Moreover, the record reflects that while Plaintiff reported sleeping and eating disturbances and complained of depression during periods in which she was coping with the illness and deaths of multiple relatives, there is no evidence of any weight loss.  The evidence instead reflects that she responded

well to medications and individual therapy, and was consistently found by the Mobile Mental Health Center to have no suicidal or homicidal thoughts, or any problems with concentrating, remembering or staying focused.  Additionally, her memory was found to be unimpaired, and her thoughts were logical and coherent.  Accordingly, the undersigned finds that there is substantial evidence supporting the ALJ's decision that "while there may have been a period during which the claimant's mental impairment significantly limited her work abilities, that period was not long enough to meet the duration period."

### 3.  The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff's next assertion is that the ALJ erred in assessing her credibility.  In considering testimony of pain and other symptoms, a claimant must show: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged symptoms or (b) that the objectively determined medical condition can reasonably be expected to give rise to the alleged symptoms.  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  Moreover, Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation Of Symptoms In Disability Claims: Assessing The

Credibility Of An Individual's Statements, 1996 WL 374186, requires the ALJ to determine whether the medically determinable impairment could reasonably give rise to the symptoms alleged. In Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995), the Eleventh Circuit explained:

> A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court . . . . A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case . . . . While an adequate credibility finding need not cite "particular phrases or formulations . . . broad findings that [a claimant] lacked credibility and could return to her past work alone are not enough to enable us to conclude that [the ALJ] considered her medical condition as a whole." . . . . If proof of disability is based upon subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Explicit credibility findings are "necessary and crucial where subjective pain is an issue." . . . .

Id. (citations omitted). See also Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991). Additionally, when making a credibility determination, the ALJ may consider plaintiff's daily activities. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987). See also 20 C.F.R. § 404.1529(c)(3)(i) (providing that "[f]actors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities[]"); 20 C.F.R. § 416.929(c)(3). Moreover, "[t]he credibility of witnesses is for the

[Commissioner] to determine, not the courts." <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1219 (11th Cir. 1991) (citing <u>Kelly v. Heckler</u>, 736 F.2d 631, 632 (11th Cir. 1984)).

In the case <u>sub judice</u>, the ALJ opined, with respect to Plaintiff's subjective complaints and allegations of functional limitations, as follows:

> The claimant's subjective complaints and allegations of functional limitations are not supported by the credible evidence of record.  While it is credible that she has limitations, the degree of limitation alleged was not persuasive.

(Tr. 24).

As noted <u>supra</u>, substantial medical evidence demonstrates that while Plaintiff has reported some sleeping and eating disturbances, and complained of depression in connection with the illnesses and deaths of multiple relatives, she has responded well to treatment and has not had suicidal or homicidal thoughts, nor has she had any problems with her memory or concentration. Moreover, while Plaintiff testified that she spends her days "[m]ostly in bed[,]" she has also reported that she listens to the radio, visits and talks on the phone to friends, regularly attends church, shops, and prepares some of her meals.  Additionally, Plaintiff's treatment records from Dr. Kovacs and the Mobile Mental Health Center do not reveal any limitations in her daily activities.  Further, the ALJ noted "[i]nterestingly, while the

claimant bases disability in large part on pain, Dr. Kovacs did not even mention pain in . . . [her] report." (Tr. 24).  The ALJ further noted that Plaintiff "has only sought and received conservative medical treatment[,]" "has not been hospitalized for pain or referred to a pain clinic" and "only uses pain medicine intermittently[.]" (Id. at 22).  Accordingly, upon consideration of the foregoing, the undersigned finds that the ALJ did not err in the weight afforded Plaintiff's subjective complaints.

**V.  Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record, it is the **RECOMMENDATION** of the undersigned Magistrate Judge that the decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this **Report and Recommendation**.

**DONE** this **19**th day of **September, 2005.**

         **/s/ SONJA F. BIVINS**
         **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.  **<u>Objection</u>**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a <u>de</u> <u>novo</u> determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); and <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. <u>See</u> Fed. R. Civ. P. 72; SD ALA LR 72.4(b).


3.   **Transcript (applicable where proceedings tape recorded)**.
Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

<u>      /s/ SONJA F. BIVINS      </u>
**UNITED STATES MAGISTRATE JUDGE**